**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PHILLIP WOODRUFF,<br><br>Plaintiff,<br><br>v.<br><br>RAY LAHOOD,<br>Secretary of the U.S. Department<br>of Transportation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | <br><br>Civil Action No.: 01-1964 (RMU)<br><br>Re Document No.: 75 |

**MEMORANDUM OPINION**

**DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The plaintiff commenced this action against his employer, the Federal Aviation Administration ("the FAA" or "the defendant"), asserting claims of retaliation and disparate treatment based on race, gender, age and disability, in violation of various federal statutes including the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*. The court previously granted summary judgment to the defendant, a decision which the plaintiff subsequently appealed. The Circuit affirmed in part but reversed the portion of the court's ruling regarding the plaintiff's claim that the defendant violated the Rehabilitation Act by failing to provide a reasonable accommodation for his disability – the only claim remaining at this juncture.

The case is now before the court on the defendant's second motion for summary judgment, in which it asserts that the plaintiff failed to provide the defendant adequate notice of his alleged disability or provide sufficient medical documentation in support of his requested accommodation. The defendant also maintains that even if the plaintiff had provided notice and proper documentation, the plaintiff received a reasonable accommodation for any alleged

disability. The court determines that because a genuine dispute of material fact exists with regard to these issues, summary judgment must be denied.

## II. BACKGROUND

### A. Factual Background

In 1995, while working as a Division Manager at the FAA, the plaintiff suffered a workplace injury, sustaining injuries to his shoulder, hip and back. Pl.'s Statement of Genuine Issues of Material Fact ("Pl.'s Statement") ¶¶ 1-2. The plaintiff's supervisor at the time approved a Telecommuting Agreement allowing the plaintiff to work from home beginning in November 1995 ("1995 Telecommuting Agreement"). *Id.* ¶ 3. He was also granted a "maxi-flex schedule" which permitted the plaintiff to determine the hours he would work within every two-week, eighty-hour pay period.[1] Pl.'s Opp'n to Def.'s 2d Mot. for Summ. J. ("Pl.'s Opp'n"), Pl.'s Decl. ¶ 5.

In April 1996, Carson Eoyang ("Eoyang") became the plaintiff's supervisor. *Id*. ¶ 8. Because the plaintiff was away on detail to another agency at the time, the plaintiff actually began working with Eoyang in February 1997. *Id*. ¶ 7. During the time that the plaintiff was on detail he continued to receive his maxi-flex schedule and telecommuting privileges. *Id.* ¶ 5.

In May 1997, the plaintiff took medical leave for a shoulder surgery related to his 1995 accident. *Id.* Days after his surgery, the plaintiff submitted to the defendant a preliminary medical report from his surgeon, Dr. Edward McFarland, indicating that the "extent of his recovery, disability and return to duty would be determined in [future medical reports]" and

[1] The maxi-flex schedule permitted the plaintiff to work any time from 6:00 a.m. to 6:00 p.m, as long as he worked during the core hours of 9:30 a.m. to 3:30 p.m. and totaled eighty hours during a two-week period. Pl.'s Statement ¶ 18.

explaining that the plaintiff had been referred to an orthopedic specialist, Dr. Claudia Thomas for his "back and hip." Pl.'s Opp'n, Ex. I ("Dr. McFarland's Preliminary Report, May 7, 1997") at 1.

In the months following his surgery, the plaintiff submitted updated medical reports by Drs. McFarland and Thomas to the Office of Workers' Compensation Program ("OWCP"). Pl.'s Statement ¶¶ 9, 23. According to the plaintiff, he provided the OWCP with all of his doctors' reports beginning after his 1995 accident to allow the OWCP to process his workers' compensation payments. Pl.'s Statement ¶ 23. Dr. McFarland's November 1997 report indicated that the plaintiff was having pain in his shoulder, back and hip, and recommended that the plaintiff "cut back on his activity" to help ease the pain. Pl.'s Opp'n, Ex. 3 ("Dr. McFarland's Report, Nov. 17, 1997") at 1. Dr. Thomas's December 1997 report focused on the plaintiff's back problems, noting that the plaintiff was struggling with prolonged periods of walking, sitting and standing due to "chronic low back pain, secondary to L5-S1 facet degeneration." Pl.'s Opp'n, Ex. 4 ("Dr. Thomas's Report Dec. 9, 1997") at 1.

Around the same time, the OWCP referred the plaintiff to another orthopedic surgeon, Dr. Levitt, in an effort to obtain a second and independent opinion regarding the plaintiff's impaired status. Pl.'s Opp'n, Ex. 2 (Dr. Levitt's Independent Medical Examination, Dec. 4, 1997 ("IME")) at 1. Dr. Louis Levitt determined that although the plaintiff's shoulder injury had resulted in a permanent impairment and that the plaintiff should "avoid repetitive use of his arms above shoulder level," it did not compromise his work capability or prevent him from handling his "pre-injury level of work responsibilities." *Id*. at 2-3; Def.'s Statement of Material Facts ("Def.'s Statement") ¶ 8. Furthermore, Dr. Levitt concluded that the plaintiff's back and hip appeared "entirely normal" and found "no active pathology . . . as residual of his September

1995 accident." *Id*. at 3. Notwithstanding the plaintiff's assertion that he could not "handle his normal work responsibilities" given his increasing back and hip pain, Dr. Levitt concluded that there was "no basis to permanently restrict his work or avocational activities." *Id.* 1-2.

Following Dr. Levitt's IME, the plaintiff submitted two additional examination reports by Dr. McFarland to the OWCP. Pl.'s Statement ¶¶ 13-14. In his January 1998 report, Dr. McFarland identified continued pain in the plaintiff's shoulder and low back and determined that the plaintiff had not yet reached a "maximum level of improvement" from his shoulder operation. Pl.'s Opp'n, Ex. J ("Dr. McFarland's Report, Jan. 16, 1998") at 2.[2] Dr. McFarland specifically recommended that the plaintiff limit any lifting over one pound and that upon returning to work in February he work only three to four hours per day, steadily increasing his hours after four to six weeks. *Id*. Dr. McFarland also noted that Dr. Thomas was treating the plaintiff for pain in his lower back and hips. *Id.* at 1. Dr. McFarland's February 1998 report mainly reiterated his previous findings, adding only that over the next three months the plaintiff should "continue his therapy, medication, evaluation, *etc*. in order to reach maximum recovery level." Pl.'s Opp'n, Ex. 8 ("Dr. McFarland's Supplemental Report, Feb. 3, 1998") at 1.

In February 1998, after nine months on medical leave, the plaintiff returned to work on a part-time basis, gradually increasing his hours until he returned full-time in March 1998. *Id*. ¶¶ 12-13. Upon his return to work, the plaintiff was permitted to resume his maxi-flex schedule and telecommuting privileges. Pl.'s Decl. ¶ 14. In early February 1998, however, Eoyang sent the plaintiff a memorandum notifying him that the FAA would be re-assessing the plaintiff's "tour of duty, restrictions, and capabilities" in light of his medical reports. Def.'s 2d. Mot. for Summ. J. ("Def.'s 2d Mot."), Ex. 12 ("Eoyang's Feb. 9, 1998 Memorandum") at 1. Indeed, internal

---

[2] According to the plaintiff, he provided a copy of this re-evaluation to an FAA human resource specialist on February 5, 1998. Pl.'s Opp'n, Ex. 7 (Patricia Pointer's E-mail, Feb. 5, 1998) at 2.

communications between the plaintiff's supervisors suggest that around this same time, they were considering whether or not to continue the plaintiff's requested maxi-flex and telecommuting accommodations. *See* Pl.'s Opp'n, Ex. 12 (Patricia Pointer's Memo, Feb. 18, 1998) at 1 (noting that "telecommuting may well be a reasonable accommodation to [the plaintiff's] disabling condition").

In April 1998, Eoyang requested that the plaintiff submit updated medical documentation so that Eoyang could determine whether continuing the plaintiff's maxi-flex and telecommuting schedule would be an appropriate accommodation for his impairments. Def.'s 2d Mot., Ex. 15 (Eoyang's Letter, Apr. 30, 1998) at 1. In response, the plaintiff notified Eoyang that his medical documentation "was filed with [the] OWCP" and had been reviewed by an FAA personnel specialist "over thirty days ago." Pl.'s Opp'n, Ex. L (Pl.'s May 1, 1998 E-mail) at 1. According to the plaintiff, all of his medical reports that were filed with the OWCP were provided to the FAA and handled by Ms. Barbara Williams who was in charge of managing OWCP claims and related matters for the FAA. Pl.'s Statement ¶ 5.

Additionally, Dr. McFarland faxed a letter to the FAA on May 1, 1998, in which he stated that

> [i]t is indicated in my report from [January 1998] that [the plaintiff] should return to regular full time administrative duties as a senior management official, with appropriate accommodations. I think [the plaintiff's] request for a flexible work schedule is reasonable, particularly in light of [his] back problems. Any accommodations that could be made at work to prevent increased stress in [his] shoulder would be recommended.

Def.'s 2d. Mot., Ex. 16 (Dr. McFarland's Letter, May 1, 1998) at 1. Upon receiving Dr. McFarland's letter, Eoyang sent the plaintiff an e-mail requesting that he "advise as to what specific accommodations and flexibilities [he would] need." Def.'s Statement ¶ 22 (Eoyang's

May 18, 1998 E-mail).[3] Less than two weeks later, Dr. McFarland sent the FAA a second letter, explaining that his evaluation of the plaintiff on May 27, 1998 had revealed that the plaintiff had a thirty percent impairment rating based on the American Medical Association's guidelines, Pl.'s Opp'n, Ex. 9 ("Dr. McFarland's Letter, May 29, 1998") at 1; *see also* Def.'s 2d Mot, Ex. 17 ("Dr. McFarland's Report, May 27, 1998") at 1. Dr. McFarland concluded that "[a] flexible work schedule would be compatible with the patient's impairment."[4] *Id.*

Unsatisfied with the level of specificity in the plaintiff's medical reports, Eoyang discontinued the plaintiff's maxi-flex schedule and telecommuting privileges on September 3, 1998. Def.'s 2d Mot., Ex. 19 ("Eoyang's Sept. 3, 1998 E-mail") at 1-2. Through an e-mail, Eoyang informed the plaintiff that:

> [w]hile I am willing to consider some flexibilities, please be advised that I can no longer accommodate a schedule whereby I do not know from day-to-day whether you will report to the office or not . . . . Any request to telecommute in the future must be discussed with me and . . . any future absence from the office must be accounted for using whatever leave category is appropriate for the circumstances.

*Id.*; *see also* Def.'s 2d Mot., Ex. 21 ("Pl.'s Letter Sept. 11, 1998") at 1 (suggesting that the plaintiff's maxi-flex schedule and telecommuting privileges were immediately revoked as of September 3, 1998). In lieu of his discontinued privileges, the defendant claims it allowed the plaintiff to take leave without pay as required. Def.'s 2d. Mot. at 26.

---

3 Although the defendant does not provide Eoyang's May 18, 1998 e-mail as a separate exhibit, it includes the e-mail in its statement of material facts. *See* Def.'s Statement ¶ 22. The plaintiff does not contest the defendant's recitation of the e-mail. *See* Pl.'s Statement ¶ 22.

4 The OWCP requested an explanation of Dr. McFarland's thirty percent rating and asked that he "provide the requisite medical evidence to support [his] previous opinion of a 30% permanent partial impairment," Def.'s Statement ¶ 24, which Dr. McFarland subsequently provided in October 1998, Pl.'s Statement ¶ 23.

## B. Procedural History

In September 2001, the plaintiff commenced this action against the defendant asserting that the defendant violated various federal statutes when it retaliated against him for his prior Equal Employment Opportunity ("EEO") activity and purportedly discriminated against him based on his age, gender, race and disability. *See generally* Compl. The defendant subsequently moved the court to dismiss the plaintiff's complaint for failure to state a claim. *See generally* Def.'s Mot. to Dismiss. In August 2002, the court granted in part and denied in part the defendant's motion. *See generally* Mem. Op. (Aug. 7, 2002). More specifically, the court permitted the plaintiff to proceed with his claims insofar as they arose from the defendant's actions occurring after July 1998. *Id.* at 6. The court also permitted the plaintiff to submit an amended complaint clarifying the legal and factual bases of his discrimination claims. *Id.* at 8.

In September 2002, the plaintiff filed his first amended complaint, *see generally* 1st Am. Compl., which was subsequently displaced by the plaintiff's second amended complaint, filed in April 2004, *see generally* 2d Am. Compl. In his second amended complaint, the plaintiff asserts, *inter alia*, that the defendant retaliated against him for prior EEO activity and discriminated against him based on race, gender, age and disability and in violation of Title VII of the Civil Rights Act of 1964 (Title VII"), the Rehabilitation Act, and the Age Discrimination in Employment Act of 1967 ("ADEA") by denying him reasonable accommodations for his disability and retaliating against him for engaging in protected EEO activity. 2d Am. Compl. ¶ 12. The defendant subsequently moved for summary judgment on these claims. *See generally* Def.'s 1st Mot. for Summ. J.

In January 2005, the court granted the defendant's motion for summary judgment on all of the plaintiff's discrimination and retaliation claims. *See generally* Mem. Op. (Jan. 5, 2005).

Specifically, the court determined that the plaintiff had failed to exhaust his administrative remedies for his discrimination claims and that the plaintiff failed to establish a prima facie case of retaliation under the Rehabilitation Act. Mem. Op. (Jan. 5, 2005) at 17-18.

The plaintiff appealed the court's ruling solely with regard to his claims that the defendant violated the Rehabilitation Act by denying him a reasonable accommodation for his disability and retaliating against him for engaging in protected EEO activity. *See* Notice of Appeal as to Order on Mot. for Summ. J. The plaintiff argued, *inter alia*, that the court had erred in determining that he had not exhausted his administrative remedies with regard to his claims. *Id.*; *Woodruff v. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007). The Circuit held that the plaintiff had properly exhausted his administrative remedies for his claim that the defendant violated the Rehabilitation Act by revoking his maxi-flex schedule and telecommuting privileges on September 3, 1998. Accordingly, the Circuit reversed and remanded for further proceedings with regard to the plaintiff's non-accomodation claim brought under the Rehabilitation Act, although it affirmed the grant of summary judgment as to the plaintiff's retaliation claim. *Woodruff*, 482 F.3d at 531.

After an additional period of discovery, the defendant filed a second motion for summary judgment in August 2010 on the plaintiff's sole remaining claim. *See generally* Def.'s 2d Mot. With this motion now ripe for adjudication, the court now turns to the applicable legal standards and the parties' arguments.

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

**B. Legal Standard for Discrimination under the Rehabilitation Act**

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or . . . conducted by any Executive agency. . . ." 29 U.S.C. § 794(a). In addition to this general non-discrimination requirement, federal employers are required to take affirmative action on behalf of disabled individuals pursuant to Section 501(b) of the Act. 29 U.S.C. § 791(b); *see also Se. Cmty. Coll. v. Davis,* 442 U.S. 397, 410-11 (1979). More specifically, a federal agency must make "reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified individual with handicaps, unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its program." *Carr v. Reno*, 23 F.3d 525, 528-29 (D.C. Cir. 1994) (quoting 29 C.F.R. § 1614.203(c)(1)).

To establish a prima facie case of discrimination under the Rehabilitation Act for an employer's failure to reasonably accommodate a disability, a plaintiff must show "(1) that [he]

was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 125 (D.D.C. 2009) (quoting *Scarborough*, 190 F. Supp. 2d at 19 (D.D.C. 2002)).

### C. The Court Denies the Defendant's Motion for Summary Judgment

#### 1. The Plaintiff Has Offered Sufficient Evidence That the Defendant Had Notice of the Plaintiff's Disabilities

The defendant argues that it did not become aware of several of the plaintiff's purported ailments, including his chronic back and hip pain, until after Eoyang's decision in September 1998 to discontinue the plaintiff's maxi-flex and telecommuting accommodations.[5] Def.'s 2d Mot. at 5. The plaintiff responds that the defendant unquestionably knew of his shoulder injury and that it either knew or should have known the extent of his other physical limitations. Pl.'s Opp'n at 17.

Employers can only be held liable for discriminating on the basis of known disabilities. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (observing that "the employer must know of both the disability and the employee's desire for accommodations for that disability"). The disabled employee typically has the burden of providing notice of the disability and the limitations it imposes. *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897-98 (D.C. Cir. 1998). The burden similarly lies with the disabled employee to request any needed accommodation. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) (stating that "[a]n underlying assumption of any reasonable accommodation claim is that the

[5] The defendant does not argue that the plaintiff was not a disabled individual under the Rehabilitation Act, and acknowledges that this point is irrelevant to its arguments at the summary judgment stage. *See* Pl.'s Reply at 6.

plaintiff-employee has requested an accommodation which the defendant-employer has denied"). A plaintiff is not required, however, to provide "precise notice" of a disability; rather it is sufficient for the employer to know of the nature and extent of the plaintiff's impairment. *See Crandall,* 146 F.3d at 898 (noting that "no great refinement of the concept of notice is needed, beyond the bedrock requirement of an adequate, prior alert to the defendant of the plaintiff's disabled status"). *Id.*

In this case, even before he returned from medical leave in February 1998, the plaintiff provided the defendant with a report by Dr. McFarland indicating that he was recovering from a "work related injury to [his] shoulder, back, and hips."[6] Dr. McFarland's Report, Jan. 16, 1998.[7] Moreover, Dr. Levitt, the physician obtained by the defendant, alerted the defendant to the fact that the plaintiff did not feel he could handle his normal work responsibilities because he could not endure the commute to and from work. Dr. Levitt's IME, Dec. 4, 1997. Indeed, shortly after the plaintiff's return to work, FAA supervisors acknowledged the plaintiff's "disabling condition" and discussed whether to extend his requested accommodations. Patricia Pointer's E-mail, Feb. 18, 1998. In May 1998, Eoyang received yet another letter from Dr. McFarland opining that a "flexible work schedule is reasonable, particularly in light of [the plaintiff's] other back problems." Dr. McFarland's Letter, May 5, 1998. Indeed, Eoyang acknowledged the

[6] The defendant disputes whether the plaintiff's medical documents filed with the OWCP would have necessarily been provided to officials at the FAA. Def.'s Reply at 6. The plaintiff's evidence suggests, however, that at least on one occasion the individual in charge of processing OWCP claims for the FAA faxed a form to the plaintiff which indicated receipt and review by the FAA of Dr. McFarland's May 1997 medical report and a medical referral to Dr. Thomas for examination of the plaintiff's back and hips. Pl.'s Statement ¶ 10. In consideration of such evidence, as well as the plaintiff's email to Eoyang notifying him of the OWCP documents, the court determines that a reasonable juror could conclude that the FAA had notice and access to the plaintiff's medical records filed with the OWCP.

[7] This plaintiff asserts this specific medical report was provided to an FAA personnel specialist on February 5, 1998. Pl.'s Statement ¶ 13.

plaintiff's "back problems" when he requested that the plaintiff provide further information regarding his desired accommodations. Eoyang's Letter, May 18, 1998.

In light of this record, the plaintiff has proffered sufficient evidence from which a reasonable juror could conclude that the defendant had knowledge of the nature and extent of the plaintiff's disability before it revoked the plaintiff's maxi-flex and telecommuting privileges on September 3, 1998. *See Green v. Am. Univ.*, 647 F. Supp. 2d 21, 34 (D.D.C. 2009) (determining that a triable issue of fact existed as to whether an employer had notice of an employee's disability based on the employee's own testimony and assertions and a physician's letter provided to his employer regarding limitations at work); *Equal Emp't Opportunity Comm'n v. Sears, Roebuck & Co*., 417 F.3d 789, 805 (7th Cir. 2005) (determining that a reasonable jury could conclude that an employer was sufficiently aware of a sales associate's disability after the employee gave the employer notes from her doctors indicating that she suffered from neuropathy and recommending that she be permitted to avoid walking long distances).

**2. A Reasonable Jury Could Conclude That Defendant Did Not Engage in the Interactive Process in Good Faith**

The defendant next argues that even if it had notice of the plaintiff's disability, it did not refuse to provide a reasonable accommodation for the disability. Def.'s Reply at 7-8. Instead, the defendant submits that it made a good faith effort to provide the plaintiff a reasonable accommodation in a timely manner. *See* Def.'s 2d Mot. at 18-22. According to the defendant, any disruption in the process of fashioning a reasonable accommodation resulted from the plaintiff's failure to provide any detail regarding what he or his doctor meant by "flexible work schedule" or otherwise specify the accommodations required for his impairments. *Id*.; Def.'s Statement ¶ 23.

In response, the plaintiff argues that the defendant did not make a good faith effort to fashion a reasonable accommodation for his disability and instead, "sat on its hands" by requesting additional documents instead of proactively determining which accommodations would have been reasonable. Pl.'s Opp'n at 25. According to the plaintiff, "[i]f the accommodations that [he] consistently requested were unreasonable to the [defendant], then [it] had the responsibility to make a concerted effort to determine the appropriate accommodations that were reasonable." *Id*. at 24-25. The plaintiff asserts that because a reasonable juror could conclude that the defendant had failed to fulfill this responsibility, entry of summary judgment for the defendant would be inappropriate. *Id*. at 26.

Once the employer knows of the disability and the employee's desire for accommodations, "it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Phoenixville Sch. Dist.*, 184 F.3d at 315; *see also* 29 C.F.R. § 1630.2(o)(3) (stating that the employer must make a reasonable effort to determine the appropriate accommodation). Determining an appropriate accommodation, however, requires a flexible, interactive process that involves a good faith effort on behalf of both the employer and the disabled employee. 29 C.F.R. § 1630.2(o)(3); *see also Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005). A party that fails to communicate, by way of initiation or response, may be acting in bad faith. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996) (observing that when the parties are "missing information . . . that can only be provided by one of the parties, . . . the party withholding the information may be found to have obstructed the process"). On the other hand,

> [e]mployers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having

> considered employee's request, and offer and discuss available alternatives when the request is too burdensome.

*Phoenixville Sch. Dist.*, 184 F.3d at 317; *see also Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1309 (D.C. Cir. 2010) (concluding that a reasonable jury could not determine that an employer acted in bad faith because had met with the disabled employee and agreed to assist the employee once she submitted the necessary paperwork).

When the interactive process breaks down, "courts should attempt to isolate the cause of the breakdown and then assign responsibility" to the culpable party. *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000) (quoting *Beck*, 75 F.3d at 1135). The defendant should only be held liable for such a breakdown if the plaintiff can "show that that the result of the inadequate interactive process was the failure of the [employer] to fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the [plaintiff] a reasonable accommodation." *Id.*

Here, the plaintiff has provided sufficient evidence to suggest that during the interactive process he adequately responded to the defendant's requests for further medical documentation. *Cf. Graffius*, 672 F. Supp. 2d at 130-31 (granting summary judgment to the defendant because the plaintiff "provide[d] no evidence that she provided the [employer] with any medical documentation of her condition in support of her accommodation requests"). Specifically, the plaintiff provided the defendant with at least three letters and reports by Dr. McFarland documenting the plaintiff's ailments and opining that the plaintiff's impairments would be ameliorated by a flexible work schedule. *See* Dr. McFarland's Letter, May 1, 1998 (stating that "request for [a] flexible work schedule is reasonable, particularly in light of [the plaintiff's] back problems"); Dr. McFarland's Report, May 27, 1998 (noting that a "flexible work schedule would be compatible" with his impairments); Dr. McFarland's Letter, May 29, 1998 (referencing the

plaintiff's condition and recommending a flexible work schedule). Additionally, the plaintiff notified the defendant that he had filed further detailed medical documentation with the OWCP, information which the plaintiff suggests was subsequently reviewed by an FAA personnel specialist.[8] Pl.'s E-mail to Eoyang, May 1, 1998. Accordingly, the plaintiff provided sufficient evidence to reasonably demonstrate that he interacted with the defendant in good faith in order to reach a reasonable accommodation.

Notwithstanding the medical reports provided by the plaintiff, the defendant maintains that the plaintiff failed to provide documentation that would have allowed the defendant to fashion a reasonable accommodation. *See* Def.'s 2d Mot. at 21. Yet the record reflects that when the defendant asked the plaintiff to "advise as to what specific accommodations and flexibilities [he would] need," Eoyang's E-mail, May 18, 1998, the plaintiff responded two days later by submitting a letter from Dr. McFarland, which opined that a "flexible work schedule" would provide a reasonable accommodation. *See* Dr. McFarland's May 29, 1998 Letter. The defendant, on the other hand, never followed up with the plaintiff to clarify what he or Dr. McFarland meant by "flexible work schedule" or to inform the plaintiff that the request for a flex work schedule was too ambiguous to assist the defendant in determining what a reasonable accommodation would entail.[9] *See Bultemeyer v. Fort Wayne Cmty. Sch.* 100 F.3d 1281, 1285 (7th Cir. 1996) (explaining that "[i]f the note [from the doctor requesting accommodation] was too ambiguous and [the employer] did not know what [the employee] wanted, [the employer] easily could have called [the doctor] for a clarification"). Nor did the defendant request a

[8] Among these reports was an evaluation by Dr. Thomas reporting that the plaintiff suffered from chronic back and hip pain which caused the plaintiff to have difficulty "walking, sitting, and standing for prolonged periods." Dr. Thomas's Report, December 9, 1997.

[9] In his May 29, 1998 letter, Dr. McFarland explicitly made himself available to the defendant to answer any questions about his evaluation of the plaintiff. *See* Dr. McFarland's Letter, May 29, 1998.

meeting with the plaintiff to discuss its concerns or present possible alternatives to the plaintiff's desired accommodations. *See generally* Def.'s 2d Mot. Instead, approximately three months after the plaintiff had responded to the defendant's request for more specific information, the defendant revoked the plaintiff's maxi-flex and telecommuting privileges. *Id*. at 26.

Because it was the defendant's responsibility to "request additional information that the employer believe[d] it need[ed]," *Phoenixville Sch. Dist*., 184 F.3d at 315, and because the evidence sufficiently suggests that the defendant did not follow up in good faith with the plaintiff to explore what type of flexible work schedule would accommodate the plaintiff's disability, the court determines that a reasonable juror could conclude that the defendant did not engage in the interactive process in good faith prior to discontinuing the plaintiff's maxi-flex and telecommuting privileges. *Fjellestad v. Pizza Hut of Am*., 188 F.3d 944, 953 (8th Cir. 1999) (noting that "summary judgment is typically precluded when there is a genuine dispute as to whether the employer acted in good faith and engaged in the interactive process of seeking reasonable accommodations"); *Phoenixville Sch. Dist*, 184 F.3d at 318 (observing that "where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded"); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-34 (7th Cir. 1998) (reversing the district court's grant of summary judgment to the employer because disputes of fact remained about which party caused the breakdown in the interactive process).

**3. The Defendant Fails to Demonstrate that It Provided the Plaintiff With a Reasonable Accommodation**

The defendant argues that notwithstanding any breakdown in the interactive process, it reasonably accommodated the plaintiff by offering an alternative accommodation of liberal leave without pay. Def.'s Reply at 8. The plaintiff contends that whether liberal leave without pay was a reasonable accommodation is a matter that the jury to decide. *See* Pl.'s Opp'n at 26.

An employer that declines to take reasonable steps to accommodate an employee's disability is liable under the Rehabilitation Act, unless the steps in question "would impose an undue hardship on the operation of the business" of the employer. *Aka*, 156 F.3d at 1300. A modification or adjustment to an employee's work schedule is "reasonable" if it seems reasonable on its face or is ordinary "in the run of cases." *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993). Although an accommodation must be effective in meeting the needs of the individual, *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (noting that "[i]t is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness"), an employer need not offer the particular accommodation preferred by the employee so long as a reasonable alternative is provided, *see Pantazes*, 366 F. Supp. 2d at 69. Once an employee has established that his proposed accommodation is reasonable,[10] the burden shifts to the employer to show that any proposed alternative accommodation is also reasonable. *See Gilbert v. Frank*, 949 F.2d 637, 639-40 (2d Cir. 1991); *Zamudio v. Patla*, 956 F. Supp. 803, 809 (N.D. Ill. 1997) ("While the burden is on plaintiff to show the feasibility of any reasonable accommodation she contends defendants failed to provide, the burden is on defendants to show that their proposed accommodation was reasonable.").

Although unpaid liberal leave may, undoubtedly, constitute a reasonable accommodation in certain situations, *see*, *e.g.*, *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801 (6th Cir. 1996), the defendant does not present any evidence that it would be an effective remedy in this case. The defendant acknowledges that the plaintiff claimed he could not work continuously due to pain and as a consequence required periodic work breaks. Def.'s 2d Mot. at 20-21. Yet the defendant

10 The defendant concedes that the plaintiff's requested accommodations of a maxi-flex schedule and telecommuting privileges were not "inherently unreasonable accommodations." Def.'s Reply at 2. Indeed, the plaintiff received these accommodations from the time of his accident in 1995 until September 1998. *Id.* at 9.

offers no explanation as to how liberal leave without pay would help accommodate this problem. *See generally id*., Def.'s Reply. Nor does the defendant provide any insight as to how liberal leave would address the plaintiff's identified difficulties with walking, sitting and standing. *See* Dr. Thomas's Report, Dec. 9, 1997. Because the defendant has failed to demonstrate that its proposed accommodation of liberal leave without pay was a reasonable accommodation for the plaintiff's disability, Def.'s 2d Mot. at 26, a genuine dispute of material fact remains as to whether the plaintiff received a reasonable accommodation for his disability.

## IV. CONCLUSION

For the foregoing reasons, the court denies the defendant's motion for summary judgment. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 29th day of March, 2011.

RICARDO M. URBINA
United States District Judge